Bohn v. Black, 2019 NCBC 34.

STATE OF NORTH CAROLINA

TRANSYLVANIA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 228

MATT BOHN and wife, LAURIE BOHN,

Plaintiffs,

v.

JUDITH BLACK; NANCY BLACK; SCOTT HATTER; JEANNE HATTER; BLACK FOREST FAMILY CAMPING RESORT, INC.; and a certain unnamed De Facto North Carolina General Partnership, a/k/a the BLACK FOREST PARTNERSHIP,

Defendants.

**ORDER AND OPINION
ON MOTIONS FOR PARTIAL
SUMMARY JUDGMENT**

1.     The Black family has operated a campground in the mountains of western North Carolina for over 20 years.  When family ties frayed in late 2016, Laurie Bohn (one of three Black daughters) and her husband, Matt Bohn, refused to support the campground any longer.  Laurie's mother, Judith Black, then threatened to cut off the Bohns' access to their home, which sits on the campground property.  This lawsuit followed.

2.     The Bohns, both plaintiffs here, allege that they worked at the campground without pay for more than two decades, while also contributing substantial funds from outside jobs along the way.  They further allege that Judith induced them to do so with promises of home ownership and, for Laurie, co-ownership of the campground business.  The amended complaint contains twelve claims against Judith, including claims for de facto partnership, breach of fiduciary duty, unjust enrichment, and

others. Laurie's two sisters (Jeanne Hatter and Nancy Black) and her brother-in-law (Scott Hatter) are named as additional defendants on the theory that they, too, have an ownership interest in the campground business that could be affected by the asserted claims.

3. Discovery is complete. Defendants have moved for summary judgment as to most but not all asserted claims, and the Bohns have cross-moved for summary judgment as to some of their own claims as well as Defendants' affirmative defenses. For the following reasons, the Court **DENIES** the Bohns' motion and **GRANTS in part** and **DENIES in part** Defendants' motion.

> *Whitfield-Cargile Law, PLLC, by Davis A. Whitfield-Cargile, and Ramsey & Pratt, PA, by Michael K. Pratt, for Plaintiffs Matt Bohn and Laurie Bohn.*
>
> *Fisher Stark, P.A., by W. Perry Fisher, II, Brad A. Stark, and Megan N. Silver, for Defendants Judith Black, Nancy Black, Scott Hatter, Jeanne Hatter, Black Forest Family Camping Resort, Inc., and a certain unnamed De Facto North Carolina General Partnership, a/k/a Black Forest Partnership.*

Conrad, Judge.

I.
BACKGROUND

4. The Court does not make findings of fact in ruling on motions for summary judgment. The following background, describing the evidence and noting relevant disputes, is therefore intended only to provide context for the Court's analysis and ruling.

5. In 1992, Judith and her late husband[1] moved to North Carolina, where they purchased two tracts of land in Transylvania County. (Dep. J. Black 9:5–7; J. Black Aff. ¶ 2, ECF No. 17.1.)[2] Their aim was to open a campground as a family business. (*See* Dep. J. Black 11:4–13; M. Bohn Aff. 1, ECF No. 67.7.) Campgrounds need campsites, picnic tables, and fire pits, among other things—none of which existed at the time the Blacks bought the property. (Dep. J. Black 9:21–10:20.) It was nearly three years before they opened to the public. (Dep. J. Black 15:12–13.)

6. Judith invited her daughters—Jeanne, Nancy, and Laurie—to join the endeavor. (Dep. L. Bohn 205:11–206:1.) Laurie contends, and Judith denies, that Judith did so with the promise that all three would co-own the business with her. (*See* Dep. L. Bohn 18:10–17, 19:17–21:24; Dep. J. Black 103:1–11.) Jeanne and Nancy helped get the campground ready to open, and Jeanne's husband, Scott, also decided to live and work at the campground. (Dep. J. Black 14:25–16:3, 264:5–13.) At the time, Laurie was attending college in New York, where she met her future husband, Matt. (Dep. M. Bohn 6:25–7:9.) After earning their degrees, Laurie and Matt moved in with the rest of the family. (L. Bohn Aff. 2, ECF No. 67.6.) By 1995, the whole

---

[1] John Black died in September 1996. (Dep. J. Black 174:10.)

[2] The record includes excerpts of deposition testimony given by most of the parties. These excerpts are spread over several exhibits in support of and opposition to both motions. Excerpts of Judith Black's testimony appear at ECF Nos. 58.1, 65.1, 67.2, and 71.4. Excerpts of Laurie Bohn's testimony appear at ECF Nos. 57.1, 65.1, and 67.1. Excerpts of Matt Bohn's testimony appear at ECF Nos. 57.2, 65.1, and 67.3. Excerpts of Scott Hatter's testimony appear at ECF Nos. 57.4, 65.1, and 67.5. Excerpts of Jeanne Hatter's testimony appear at ECF Nos. 57.3, 65.1, 67.4, and 71.5.

family—including Matt and Scott—worked at the campground in some capacity. (*See* Dep. J. Black 16:13–17:6, 18:22–19:4, 264:14–23.)

7.    The campground operated as an unincorporated business until 2004, when Judith incorporated it as Black Forest Family Camping Resort, Inc. (J. Black Aff. ¶ 11.)    She is the corporation's only officer and shareholder; no shares, stock certificates, or other ownership documents have ever been issued to any other member of the family. (J. Black Aff. ¶ 11; Dep. J. Black 120:20–121:11; Dep. L. Bohn 67:9–68:7; Dep. M. Bohn 115:2–24.)    The corporation apparently owns some campground assets, but the real property on which it sits remains in Judith's name. (*See* Dep. J. Black 329:11–20; J. Black Aff. ¶ 11; L. Bohn Aff. 2.)

8.    It seems that money was tight in the years before and after the campground opened.    Early on, Matt lent Judith $20,000 from his own savings to cover debts incurred in building the campground. (Dep. M. Bohn 32:4–12; M. Bohn Aff. 1.)    And when Matt and Laurie married in 1995, they lent Judith another $15,000 from money received as wedding gifts. (Dep. M. Bohn 42:10–15; M. Bohn Aff. 2.)    This second loan went toward a swimming pool at the campground, all to attract more campers. (*See* M. Bohn Aff. 2.)    Judith admits that she never repaid either loan. (*See* Dep. J. Black 286:18–287:1.)

9.    During those lean years, the family also began pooling their resources. Everyone worked at the campground without receiving wages. (*See* Dep. J. Black 17:7–12, 172:14–20, 315:17–20.)    Laurie, Matt, Jeanne, Scott, and Nancy also handed over all income earned from outside jobs.    (*See* Dep. J. Black 262:19–263:24.)

Together with the campground's revenue and Judith's Social Security benefits and inheritance money, these earnings were pooled in a common or general fund controlled by Judith. (Dep. J. Black 31:19–23, 39:7–24, 123:23–124:7.) She used the general fund to pay the campground's bills and to pay for most, if not all, day-to-day expenses of the Black family members. (Dep. J. Black 20:14–21:24, 173:21–174:7; L. Bohn Aff. 2; M. Bohn Aff. 1–2.) Judith also gave an allowance to each individual—including her grandchildren in later years—in an amount that she set and adjusted over time. (*See* Dep. J. Black 142:1–146:3; Dep. J. Hatter 116:2–117:4.) Everyone knew that Judith controlled the family purse; they contributed without knowledge of how the money was spent or what amount was in the fund at any given time. (*See* Dep. L. Bohn 95:2–4; Dep. J. Hatter 171:8–12, 183:24–184:5; Dep. J. Black 135:8–16.)

10. Tracking what went into and out of the general fund is difficult, perhaps impossible. No accounting ever seems to have been done. (*See* Dep. J. Black 135:8–136:4.) Jeanne denies knowing what she put in or received from it. (*See, e.g.*, Dep. J. Hatter 45:13–46:23, 104:11–105:22.) And the manner of collecting and distributing money appears to have changed over time. (*See* Dep. J. Black 142:20–146:9, 168:14–171:16.) Indeed, the fund itself is spread over Judith's personal checking account, the corporation's checking account, and cash on hand at the campground. (Dep. J. Black 33:1–3, 51:15–53:20.)

11. Over time, this communal arrangement would become a source of friction. After a few years, the Bohns moved off the campground property to an apartment of their own, and each found new jobs. (Dep. L. Bohn 44:20–45:18.) Laurie continued

to give her paychecks to Judith, but Matt decided to keep his. (Dep. L. Bohn 46:25–47:10; Dep. M. Bohn 50:5–12.) Both worked at the campground on nights and weekends, still without pay. (Dep. L. Bohn 47: 9–13; L. Bohn Aff. 3.) When marital strain led to a brief separation, Laurie returned to the campground. (Dep. L. Bohn 44:3–44:12, 55:7–11; Dep. M. Bohn 54:11–25.) The couple reconciled in late 2001, but as a condition of returning to the campground, Matt would not contribute his outside salary to the general fund. (M. Bohn Aff. 2, 4; J. Black Aff. ¶ 10.) Matt believes the rest of the family resented him for it. (M. Bohn Aff. 3–4.)

12. At some point around this time, the campground seems to have turned the corner. There was enough money to build a house for Jeanne and Scott in 2004. (*See* M. Bohn Aff. 2.) A modular home for Laurie and Matt, now with three children, followed in 2006. (J. Black Aff. ¶ 14; Dep. M. Bohn 91:8–14; Pls.' Br. in Opp'n Defs.' Mot. Partial Summ. J. Ex. K, ECF No. 67.11.) According to Laurie, having a home on campground property was one of the promises that Judith made to induce her to live and work there. (L. Bohn Aff. 2–3; Dep. J. Black 173:4–7.) How the modular home was paid for is unclear. Laurie states that she used her income to obtain a line of credit, but did not make direct payments toward the house. (L. Bohn Aff. 3; Dep. L. Bohn 213:11–16.) Judith, on the other hand, claims the payments toward Laurie's line of credit and to the building company came from either the campground's business funds or Judith's inheritance money. (J. Black Aff. ¶ 15; Dep. J. Black 68:15–21.)

13. The next decade or so passed uneventfully. Judith's daughters and their husbands continued to work for the campground without receiving wages. (*See* Dep. J. Black 34:18–25, 315:4–20.) At some point, Nancy and Scott decided to work exclusively at the campground, but Laurie and Jeanne continued to work other jobs and contribute their wages to the general fund. (Dep. J. Black 35:1–11.) Matt, too, worked an outside job but did not contribute his wages to the general fund. (*See* Dep. M. Bohn 9:4–12; Dep. L. Bohn 58:5–17.)

14. In late 2016, the Bohns had a sudden falling out with Judith and the rest of the family. As Laurie and Matt tell it, the family issued an ultimatum out of the blue: either Matt would agree to turn over his expected Social Security benefits to the general fund (apparently upon reaching retirement age some twenty years in the future), or the Bohns must leave the campground. (*See* Dep. M. Bohn 127:23–128:15, 131:12–133:25.) They refused. (*See* Dep. M. Bohn 133:21–25; M. Bohn Aff. 4.) From that point forward, they also stopped working at the campground, and Laurie ceased giving her income to Judith. (Dep. M. Bohn 134:16–24; Dep. J. Black 217:9–15.)

15. Despite the flare-up, the Bohns continued to live in the modular home on campground property. (*See* J. Black Aff. ¶¶ 19, 21.) In May 2017, Judith sent a letter demanding rent and stating that she intended to block the Bohns from accessing their home. (Pls.' Br. in Opp'n Defs.' Mot. Partial Summ. J. Ex. M, ECF No. 67.13.) The Bohns filed this lawsuit against Judith and Black Forest Family Camping Resort, Inc. a few days later. (Compl., ECF No. 1.) The Bohns sought and received a temporary restraining order to prevent Judith from blocking access to their house,

cutting off water, or charging rent. (TRO 4, ECF No. 2.) This Court then granted the Bohns' motion for preliminary injunction and enjoined Judith under substantially the same terms as the temporary restraining order. (Order Granting Mot. Prelim. Inj. 11, ECF No. 24.)

16.     The Bohns later amended the complaint to add Nancy, Jeanne, and Scott as defendants, alleging that each holds a potential ownership interest in the campground business that could be affected by the asserted claims. The amended complaint includes nine causes of action: breach of fiduciary duty, undue influence, unjust enrichment, equitable estoppel, two distinct breaches of contract, conversion, de facto partnership, and declaratory judgment. It also includes another three claims for various remedies, including an accounting, appointment of a receiver, constructive trust, and injunctive relief. Among other things, the Bohns allege that Judith induced them to work at the campground without pay and to contribute additional funds, all on the promise that they would receive a home and that Laurie would co-own the campground business with her mother and sisters. On that basis, they contend the campground is a de facto partnership, that Judith breached a fiduciary duty she owed to them, and that Judith would be unjustly enriched if permitted to keep the home and exclusive ownership of the campground business. In recovery, they seek ownership of the home, one-quarter of the campground business, and the real estate associated with both through the imposition of a constructive trust. (Am. Compl. p.9, ECF No. 26.)

17.     Both sides moved for summary judgment on many but not all claims.  These motions have been fully briefed, and the Court held a hearing on January 11, 2019, at which all parties were represented by counsel.  (ECF No. 72.)  After the hearing, the Bohns voluntarily dismissed their claim for wrongful taking and conversion.  (ECF No. 73.)  The motions are now ripe for decision.

## II.
## LEGAL STANDARD

18.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party," taking the non-movant's evidence as true and drawing inferences in its favor. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001) (internal citations and quotation marks omitted).  The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002).

19.     As to the Bohns' motion for offensive summary judgment on their own claims, "a greater burden must be met." *Brooks v. Mt. Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728, 269 S.E.2d 704, 705 (1980); *accord Almond Grading Co. v. Shaver*, 74 N.C. App. 576, 578, 329 S.E.2d 417, 418 (1985).  "[The movant] must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is

no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721, 329 S.E.2d 728, 729 (1985); *see also Kidd v. Early*, 289 N.C. 343, 370, 222 S.E.2d 392, 410 (1976) (same). For that reason, it is "rarely . . . proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243, 316 S.E.2d 350, 352 (1984).

## III.
## ANALYSIS

20. The Bohns allege that they lived and worked under Judith's "coercive" influence for years because of her promises of homeownership and shared ownership of the campground business. (Am. Compl. p.2.) They claim they are entitled to their share of the campground and its land, along with the modular home they have lived in for the past decade. Defendants argue that the Bohns voluntarily contributed to the family business and are not entitled to any such relief.

21. The parties' cross-motions overlap on many but not all claims. For clarity, the Court proceeds claim by claim, addressing the competing motions together rather than in sequence.

### A. De Facto Partnership

22. Though enumerated as Claim IX in the amended complaint, the claim for de facto partnership looms over this dispute. Through this claim, Laurie seeks to establish that the campground business is a partnership and that she owns one-fourth of the campground business and the land on which it sits. Laurie bases the claim on Judith's alleged promise that each of her daughters would be co-owners of the campground. (Am. Compl. p.11.) If Laurie is correct, she may be entitled to

dissolution of the partnership and a distribution of her share of its assets.[3] Both sides move for summary judgment on this claim.

23. "A partnership is an association of two or more persons to carry on as co-owners a business for profit." N.C. Gen. Stat. § 59-36(a). In other words, a partnership arises when individuals "combine their property, effects, labor, or skill in a common business or venture." *Johnson v. Gill*, 235 N.C. 40, 44, 68 S.E.2d 788, 792 (1952) (citation and quotation marks omitted). No formal agreement is required—a de facto partnership may exist if the parties' conduct demonstrates "a voluntary association of partners." *Best Cartage, Inc. v. Stonewall Packaging, LLC*, 219 N.C. App. 429, 438, 727 S.E.2d 291, 299 (2012). Our courts have emphasized, though, that "co-ownership and sharing of any actual profits are indispensable requisites for a partnership." *Id.* (quoting *Wilder v. Hobson*, 101 N.C. App. 199, 202, 398 S.E.2d 625, 627 (1990)).

24. Laurie argues that she has satisfied both indispensable requirements as a matter of law. Laurie contends that she, Jeanne, and Nancy all held themselves out as co-owners, with Judith's encouragement and permission. (Pls.' Br. in Supp. Mot. Partial Summ. J. 10, ECF No. 52 ["Pls.' Br. in Supp."], *see also* Dep. L. Bohn 42:22–43:10, 209:6–15.) In addition, Laurie points to evidence that she and her sisters

---

[3] Though not expressly identified as such, this claim appears to be one for an alleged breach of an implied partnership agreement, for judicial dissolution of the alleged partnership, or for both. The Court refers to the claim as Laurie's because the amended complaint does not allege that Matt is also a partner. (*See* Am. Compl. p.11 (identifying "the four general and equal partners" as Judith, Laurie, Nancy, and Jeanne).) At the hearing, counsel for the Bohns conceded that Matt and Scott have no interest apart from the interests, if any, of their wives. Thus, only Laurie asserts the partnership claim, and the Court analyzes the claim on that basis.

worked at the campground without pay and also contributed to the family's general fund all wages from other jobs. (Pls.' Br. in Supp. 9; *see also* Dep. L. Bohn 208:5–17.) According to Laurie, Judith was required to make payments out of the general fund equally for the benefit of all. (Pls.' Br. in Supp. 9.)

25. Defendants, on the other hand, highlight Laurie's deposition testimony, in which she denied sharing in campground profits or receiving a share of income. (Mem. in Supp. Defs.' Mot. Partial Summ. J. 11–12, ECF No. 54 ["Defs.' Mem. in Supp."]; *see also* Dep. L. Bohn 166:4–22.) Defendants also contend that Laurie cannot show co-ownership. They point to evidence that Judith is the sole shareholder of Black Forest Family Camping Resort, Inc. (Defs.' Mem. in Supp. 13; *see also* Dep. L. Bohn 67:9–68:7; J. Black Aff. ¶¶ 11, 12.) They further argue that Laurie had no control over campground property or ability to govern its operations. (Defs.' Mem. in Supp. 13.)

26. After careful consideration, the Court concludes that the undisputed evidence requires summary judgment in favor of Defendants. Simply put, "the indispensable requisite of co-ownership of the business is lacking." *McGurk v. Moore*, 234 N.C. 248, 252, 67 S.E.2d 53, 56 (1951).

27. To start, it is undisputed that the campground business is formally organized as a corporation, not a partnership; that none of Judith's daughters or their husbands own stock in the corporation; and that Judith is its sole shareholder. (J. Black Aff. ¶ 11; Dep. J. Black 120:20–121:11; Dep. L. Bohn 67:9–68:7; Dep. M. Bohn 115:2–24.) By the time Judith incorporated the business in 2004, it had already been

in operation for nearly a decade. (*See* J. Black Aff. ¶¶ 3, 11.) Laurie did not object to the new corporate form, nor did she take any steps to preserve her alleged ownership interest, through the issuance of stock or otherwise. (*See* Dep. L. Bohn 157:3–25.) There is also no evidence that any party, including Laurie, has ever filed a state or federal income tax return identifying the campground as a partnership, either before or after the business was incorporated. Indeed, it appears that Laurie has never reported income of any kind from the campground on her personal tax returns. (*See* Dep. L. Bohn 166:1–3.) This evidence, all undisputed, strongly suggests that no legal partnership existed. *See, e.g.*, *Qubain v. Granberry*, 2007 N.C. App. LEXIS 27, at *7–8 (N.C. Ct. App. Jan. 2, 2007) (unpublished); *Wilder*, 101 N.C. App. at 203, 398 S.E.2d at 628; *G.R. Little Agency, Inc. v. Jennings*, 88 N.C. App. 107, 110, 362 S.E.2d 807, 810 (1987).

28. At most, Laurie's evidence shows that she and her sisters sometimes referred to themselves as co-owners when interacting with campers and on social media, all with Judith's permission. (*See* Dep. J. Black 103:14–25; Dep. L. Bohn 209:10–18; Dep. J. Hatter 75:15–24, 86:5–87:10.) Jeanne now denies ever having been a co-owner of the campground, claiming that she said so only to boost her credibility with customers. (*See* Dep. J. Hatter 65:16–25, 75:25–76:24, 113:14–20.) Nancy was not deposed, and her views are unknown. But even if Laurie and her sisters believed a partnership existed, that belief, standing alone, "cannot create a legal partnership." *Dealers Supply Co. v. Cheil Indus.*, 348 F. Supp. 2d 579, 589 (M.D.N.C. 2004); *see also Anderson v. Brokers Inc. (In re Brokers, Inc.)*, 363 B.R. 458,

470 (Bankr. M.D.N.C. 2007) ("A general statement that parties are partners cannot outweigh the conduct of the parties."). There must be some other indicia of actual co-ownership.

29.     Such indicia are lacking here.  There is no evidence that Laurie (or her sisters) exercised independent managerial judgment over the campground.  *See, e.g.*, *G.R. Little Agency*, 88 N.C. App. at 110, 362 S.E.2d at 810; *Zickgraf Hardwood Co. v. Seay*, 60 N.C. App. 128, 133–34, 298 S.E.2d 208, 211 (1982).  Rather, all of the evidence shows that Laurie did not, and could not, exercise independent judgment or control of the campground business.  Laurie testified that she never felt as if she had an equal vote with her mother in running the campground and that her mother was the one whose lead "we had to follow." (Dep. L. Bohn 219:3–11.) Judith would always make the final decision even if Laurie or the other family members dissented.  (Dep. L. Bohn 219:12–16; Dep. J. Black 123:23–124:7; 236:14–237:23.)  Indeed, Laurie considered Judith the "boss," assigning duties that others then executed.  (Dep. L. Bohn 218:12–20.)  It also bears noting that the real property that is home to the campground is titled in Judith's name, and Judith has absolute control over that property.  (*See* J. Black Aff. ¶¶ 11, 13; Dep. J. Black 329:12–15.)

30.     In short, the undisputed evidence shows that Judith controlled the money coming into and going out of the campground business and made all major decisions related to the campground.  Laurie and her sisters had no "authority of any kind over each other" or over the campground business and its property.  *Wilder*, 101 N.C. App. at 203, 398 S.E.2d at 628; *see also Builder Mart of Am. v. First Union Corp.*, 2003

N.C. App. LEXIS 517, at *14–15 (N.C. Ct. App. Mar. 18, 2003) (unpublished) (affirming order granting summary judgment because no evidence indicated that plaintiff held equal right of control over alleged partnership property).

31. Taking the evidence in a light most favorable to Laurie, the Court concludes that the essential element of co-ownership is lacking. Thus, the Court grants Defendants' motion for summary judgment as to the claim for de facto partnership and denies the Bohns' motion. The Court need not address Defendants' alternative argument that this claim is barred by the statute of limitations.

## B. Breach of Fiduciary Duty

32. As alleged, Judith held nearly despotic control over her family and the campground business. The Bohns claim that Judith owed them a fiduciary duty as a result and that she breached that duty by, among other things, blocking access to their home and mismanaging the money they contributed to the family's general fund. (*See* Am. Compl. pp.6–7 (Claim I).) Again, both sides seek summary judgment in their favor as to this claim.[4]

33. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). A fiduciary relationship arises when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing confidence." *Dallaire v.*

---

[4] In their opening brief, Defendants express uncertainty over whether the amended complaint asserts a claim for breach of fiduciary duty against anyone other than Judith. (*See* Mem. in Supp. 8–9.) The Court reads the amended complaint to allege a fiduciary relationship between the Bohns and Judith, but not any other defendant. (*See, e.g.*, Am. Compl. pp.6–7.)

*Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014) (quoting *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013)). This definition is expansive yet exacting: "only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 475, 675 S.E.2d 133, 138 (2009) (citing *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998)).

34. To the extent this claim is based on the fiduciary duties that partners owe to one another, it must fail. *See, e.g.*, *Casey v. Grantham*, 239 N.C. 121, 124, 79 S.E.2d 735, 738 (1954) ("It is elementary that the relationship of partners is fiduciary . . . ."). As discussed, the undisputed evidence is insufficient to establish a legal partnership between Judith and Laurie.

35. Defendants argue that the only other alleged basis for a fiduciary relationship is the parent-child relationship between Judith and Laurie. (*See* Defs.' Mem. in Supp. 9.) They cite case law holding that family relationships are generally not fiduciary relationships. On that basis, Defendants contend that "[n]o further explanation or analysis is needed." (Defs.' Mem. in Supp. 9.)

36. This argument is not persuasive. It is true that "[a]n allegation of a mere family relationship is not particular enough to establish a confidential or fiduciary relationship." *Benfield v. Costner*, 67 N.C. App. 444, 446, 313 S.E.2d 203, 205 (1984) (citations and quotation marks omitted); *see also Davis v. Davis*, 236 N.C. 208, 211, 72 S.E.2d 414, 416 (1952) (noting that the parent-child relationship "is a family

relationship, not a fiduciary one, and such relationship does not raise a presumption of fraud or undue influence"). But there are certainly circumstances in which a family relationship can become a fiduciary relationship, particularly when one person assumes control or direction over the interests or affairs of another. *See Keister v. Nat'l Council of the YMCA of the United States*, 2013 NCBC LEXIS 32, at \*19 (N.C. Super. Ct. July 18, 2013) (collecting cases where a fiduciary duty arose based on "special circumstances"). In such cases, the existence of "a close family relationship can serve as a factor for consideration" that weighs in favor of finding a fiduciary relationship. *Hewitt v. Hewitt*, 252 N.C. App. 437, 443, 798 S.E.2d 796, 800 (2017).

37. That is what the Bohns allege. They do not argue that a fiduciary relationship arose solely from the parent-child relationship (which, of course, Judith and Matt do not share). Rather, the Bohns rely on Judith's management of the family's general fund. The evidence shows that Laurie and Matt, along with all other family members, contributed substantial sums to the general fund over the past two decades. (*See, e.g.*, Dep. L. Bohn 213:3–10; Dep. M. Bohn 50:13–24.) Judith wholly controlled this fund. (*See* Dep. L. Bohn 95:8–12; Dep. J. Black 236:14–237:23.) No one in the family knew how much money was in the fund at any given point, and decisions as to how the money would be spent were left to Judith's discretion. (*See* Dep. L. Bohn 95:2–4; Dep. J. Black 123:23–124:7; Dep. J. Hatter 183:24–184:5.) From this evidence, a jury could conclude that the Bohns entrusted Judith with control over a significant part of their finances, such that she was required to manage the fund in their best interests.

38. This does not mean the Bohns are entitled to summary judgment in their favor, as they contend. It is "rarely . . . proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell*, 69 N.C. App. at 243, 316 S.E.2d at 352. And whether a fiduciary relationship exists "is generally a question of fact for the jury." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 178, 684 S.E.2d 41, 53 (2009).

39. This is not the rare circumstance in which offensive summary judgment would be proper. The relationship between Judith, her children, and the campground defies easy definition. Given the nature of the work performed by Laurie, Matt, and the others, a neutral observer might think they were unpaid employees in a family business. Some family members resisted that label in their depositions, (*see* Dep. S. Hatter 10:7–25; Dep. J. Hatter 114:6–19), but the jury may find it apt. If so, the jury may have reason to conclude that a fiduciary relationship does not exist between Judith and the Bohns. *See Timbercreek Land & Timber Co., LLC v. Robbins*, 2017 NCBC LEXIS 64, at *20 (N.C. Super. Ct. July 28, 2017) ("In general, an employer-employee relationship does not give rise to fiduciary duties.").

40. Moreover, Defendants have offered evidence that Laurie and Matt are capable, college-educated adults; that they freely left the campground at certain points; and that Matt has not contributed his income to the general fund since 1999. (*See* L. Bohn Aff. 1; Dep. M. Bohn 120:17–19, 135:13–17; Dep. L. Bohn 44:14–45:3.) Taken in a light most favorable to Judith, this evidence could suggest that the balance of power, financial intelligence, and business acumen was relatively level, not skewed in her favor. *See, e.g., White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293–94,

603 S.E.2d 147, 155 (2004); *Kaplan*, 196 N.C. App. at 476, 675 S.E.2d at 138–39. Whether Judith in fact held "all the cards" in the relationship is a question for the jury. *See Kaplan*, 196 N.C. App. at 476, 675 S.E.2d at 139.

41. There are at least two other reasons to deny the Bohns' motion as to this claim. The first has to do with damages. One element of a claim for breach of fiduciary duty is that the breach proximately caused injury to the plaintiffs. *See Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at \*23 (N.C. Super. Ct. Jan. 27, 2017). The evidence on this element is nebulous. It is clear that the Bohns contributed funds to the campground and that they received allowances, expenses, and other sums in return. Yet the record does not reveal exactly how much they put in or took out over the years, much less how those sums compare with the contributions and withdrawals of other family members. Whether the Bohns were injured and whether that injury can be measured remain unresolved.

42. Second, Defendants have asserted the statute of limitations as a defense. The statute of limitations for a claim for breach of fiduciary duty is three years. *See, e.g.*, *Toomer v. Branch Banking & Tr. Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335 (2005) (citing N.C. Gen. Stat. § 1-52(1)). Having reviewed the record, the Court concludes that there are genuine disputes of fact as to whether the Bohns knew or should have known of the facts giving rise to their claim more than three years before filing this action. *See id.* at 69, 614 S.E.2d at 336.

43. The Court therefore denies both motions for summary judgment as to the claim for breach of fiduciary duty.

## C. Undue Influence

44. Undue influence is a claim usually seen in will contests, arising from allegations that someone induced the testator, in a weakened mental state, to revoke or alter a will. The Bohns allege something rather different: that Judith used "her strong will and intimidation" to "coerce" them into paying her large sums of money over the past two decades. (Am. Compl. p.7 (Claim II).) Defendants move for summary judgment, arguing that there is no evidence these "two grown professionals with college degrees" were unduly influenced. (Defs.' Mem. in Supp. 20.) The Court agrees.

45. Our appellate courts have observed that undue influence "is usually difficult to prove." *In re Will of Dunn*, 129 N.C. App. 321, 328, 500 S.E.2d 99, 104 (1998). It "is defined as 'the exercise of an improper influence over the mind and will of another to such an extent that his professed act is not that of a free agent, but in reality is the act of the third person who procured the result.'" *Hayes v. Turner*, 98 N.C. App. 451, 456, 391 S.E.2d 513, 516 (1990) (quoting *Lee v. Ledbetter*, 229 N.C. 330, 332, 49 S.E.2d 634, 636 (1948)). Undue influence requires "more than mere influence or persuasion because a person can be influenced to perform an act that is nevertheless his voluntary action." *In re Will of Jones*, 362 N.C. 569, 574, 669 S.E.2d 572, 577 (2008) (quoting *In re Will of Andrews*, 299 N.C. 52, 53, 261 S.E.2d 198, 199 (1980)). "It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, which could not be resisted, so that the end

reached is tantamount to the effect produced by the use of fear or force." *Id.* (quoting *In re Will of Turnage*, 208 N.C. 130, 132, 179 S.E. 332, 333 (1935)).

46. That is a high bar and, of course, requires evidence that the victim is in a physical or mental state that renders him or her subject to the coercive influence of another. Individuals who are of sound mind and body are generally not susceptible to undue influence. The undisputed evidence shows that Laurie and Matt are college graduates, have held multiple jobs outside the campground, and are currently raising three children of their own. No evidence suggests that either suffers from an illness or other form of "physical and mental weakness." *In re Will of Campbell*, 155 N.C. App. 441, 455, 573 S.E.2d 550, 561 (2002). Nor are they of advanced age; both joined the campground in their twenties and are now in their forties. Put simply, the facts of this case have nothing in common with those of other cases in which courts have found undue influence. *See, e.g.*, *Tortorgul v. Abayhan (In re Will of Biatschora)*, 207 N.C. App. 174, 187, 700 S.E.2d 50, 59 (2010) (discussing undue influence over 76-year-old with terminal cancer); *In re Will of McDonald*, 156 N.C. App. 220, 229–30, 577 S.E.2d 131, 138 (2003) (discussing undue influence over 87-year-old who "became easily confused by her medications").

47. The Bohns have not marshalled evidence sufficient to permit a jury to conclude that they were "susceptible to fraud or undue influence." *In re Will of Campbell*, 155 N.C. App. at 457, 573 S.E. 2d at 562. Thus, the Court grants Defendants' motion for summary judgment as to the claim for undue influence. The claim is dismissed with prejudice.

## D. Equitable Estoppel

48. The Court also grants Defendants' motion for summary judgment as to the claim for equitable estoppel. The Bohns claim that Judith should be estopped from denying having promised that the couple would own their home and that Laurie would own part of the campground business. (Am. Compl. pp.8–9 (Claim IV).) But "North Carolina does not recognize equitable estoppel as an affirmative cause of action." *Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC*, 2018 NCBC LEXIS 7, at *16–17 (N.C. Super. Ct. Jan. 24, 2018) (listing cases); *see also Chapel H.O.M. Assocs., LLC*, 808 S.E.2d 576, 579 (N.C. Ct. App. 2017). Equitable estoppel is instead "a defense which can only be considered when set out in [an] answer." *Aldridge Motors, Inc. v. Alexander*, 217 N.C. 750, 756, 9 S.E.2d 469, 473 (1940). This claim is dismissed with prejudice.

## E. Unjust Enrichment

49. The claim for unjust enrichment is based on the work that Laurie and Matt performed at the campground without pay and the additional monetary contributions they've made to the business. They claim that these contributions benefitted Judith and that she would be unjustly enriched if permitted to keep the modular home and the surrounding land and to maintain exclusive ownership of the campground business. (*See* Am. Compl. pp.7–8 (Claim III).) Defendants move for summary judgment in their favor as to this claim.

50. "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair

for the recipient to retain them without the contributor being repaid or compensated." *JPMorgan Chase Bank, N.A. v. Browning*, 230 N.C. App. 537, 542, 750 S.E.2d 555, 559–60 (2013). There are five elements: (1) "one party must confer a benefit upon the other party;" (2) "the benefit must not have been conferred officiously;" (3) "the benefit must not be gratuitous;" (4) "the benefit must be measurable;" and (5) "the defendant must have consciously accepted the benefit." *Butler v. Butler*, 239 N.C. App. 1, 7, 768 S.E.2d 332, 336 (2015) (quoting *JPMorgan Chase*, 230 N.C. App. at 541–42, 750 S.E.2d at 559). In other words, the facts must demonstrate that "property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 417, 537 S.E.2d 248, 266 (2000).

51. In support of their motion, Defendants make a narrow argument. According to Defendants, Laurie and Matt received a great deal in return for their contributions: "shelter, an allowance, food and groceries, child care and even access to a swimming pool and other recreational areas." (Defs.' Mem. in Supp. 16.) This, Defendants contend, "was a fair trade," such that there could be no unjust enrichment. (Defs.' Mem. in Supp. 16.)

52. Things are not so tidy. Some evidence suggests that Judith induced Laurie and Matt to contribute their time and money to the campground based on the promise that they would receive a home and that Laurie would co-own the campground business. (*See* Dep. L. Bohn 207:11–15, 228:10–17; L. Bohn Aff. 2–3.) Whether

Judith actually made those promises is disputed, but the Court must accept them as true at this stage, and Laurie and Matt assert that they contributed their labor and money in reliance on them. (*See* Dep. L. Bohn 207:16–208:22, 214:20–24; L. Bohn Aff. 2.) Laurie and Matt have also pointed to evidence that they built their modular home, at least in part, using their own money. (*See* M. Bohn Aff. 2–3; L. Bohn Aff. 3.) If the jury credits the Bohns' view of the facts, it could conclude that Judith induced them to improve her land and business based on promises she failed to keep. The jury could also conclude that Judith would be unjustly enriched if allowed to keep the benefit of those improvements. *See, e.g.*, *Graham v. Martin*, 149 N.C. App. 831, 834, 561 S.E.2d 583, 585–86 (2002) (affirming finding of unjust enrichment based on evidence that plaintiffs had improved defendants' land but were ejected from it); *see also Hall v. Mabe*, 77 N.C. App. 758, 761, 336 S.E.2d 427, 429 (1985) (affirming submission of unjust enrichment claim to the jury when plaintiff improved in-laws' property).[5]

---

[5] One other observation bears note. Unjust enrichment "is an equitable claim." *Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 211 N.C. App. 252, 264, 712 S.E.2d 670, 679 (2011). In the event the Bohns prevail, the Court will need to fashion an equitable remedy, bearing in mind the conduct of all parties and the need to achieve an equitable result. *See, e.g.*, *Sara Lee Corp. v. Carter*, 351 N.C. 27, 36, 519 S.E.2d 308, 314 (1999) ("It is a long-standing principle that when equitable relief is sought, courts claim the power to grant, deny, limit, or shape that relief as a matter of discretion." (citation and quotation marks omitted)); *Loving v. Webb*, 2014 N.C. App. LEXIS 840, at *12 (N.C. Ct. App. Aug. 5, 2014) (unpublished). One factor the Court may consider is whether and how the parties have paid taxes on the funds and property in dispute. The deposition testimony of several witnesses suggests that the corporation has paid some form of income tax but that personal income taxes or property taxes on certain assets may have gone unpaid. (*See, e.g.*, Dep. L. Bohn 166:1–3; Dep. M. Bohn 58:12–14, 101:11–13, 140:5–8; Dep. J. Black 54:10–12, 135:17–21.) Whether this approach runs afoul of state or federal tax laws is unclear. If, after all the evidence is received, it appears that the parties have collectively shirked their tax obligations for more than 20 years, the Court may consider that fact in fashioning an appropriate equitable remedy.

53.  The Court denies Defendants' motion for summary judgment on the claim for unjust enrichment.

### F.  Remedial Claims

54.  The Bohns assert claims for a constructive trust, a permanent injunction, an accounting of all moneys paid to Judith, and appointment of a receiver to take over Black Forest Family Camping Resort, Inc.  (*See* Am. Compl. p.9 (Claim V); p.12 (Claim X); pp.12–13 (Claim XII).)  All are potential remedies, not independent causes of action.  *See Weatherford v. Keenan*, 128 N.C. App. 178, 179, 493 S.E.2d 812, 813 (1997) (constructive trust); *Brewster v. Powell Bail Bonding, Inc.*, 2018 NCBC LEXIS 76, at *18 (N.C. Super. Ct. July 26, 2018) (injunction); *Hampton v. Hanzel*, 2018 NCBC LEXIS 66, at *69–70 (N.C. Super. Ct. June 29, 2018) (accounting); *Johnston v. Johnston Props., Inc.*, 2018 NCBC LEXIS 119, at *42 (N.C. Super. Ct. Nov. 15, 2018) (receiver).

55.  In seeking and opposing summary judgment as to these remedies, the parties largely rely on their arguments about the merits of the underlying causes of action, including the claims for de facto partnership, breach of fiduciary duty, and unjust enrichment.  Defendants argue, for example, that the Bohns are not entitled to an accounting or to the appointment of a receiver because their claims for de facto partnership and breach of fiduciary duty are defective.  (*See* Defs.' Mem. in Supp. 23–24.)  The Bohns, on the other hand, argue that they are entitled to an accounting as a matter of law "by virtue of the fiduciary status of Judith Black."  (Pls.' Br. in Supp. at 7–8.)  The Court has concluded that the claims for breach of fiduciary duty and

unjust enrichment must be decided by a jury. Accordingly, the Court denies both sides' motions to the extent they seek summary judgment as to the remedies of accounting and receivership.

56.    It would also be premature to address the Bohns' requests for a constructive trust and permanent injunction. In the Order granting the Bohns' motion for a preliminary injunction, the Court concluded that they had shown a likelihood of success on the merits of the claim for unjust enrichment and that a constructive trust is an available remedy for that claim. (*See* Order Granting Mot. Prelim. Inj. 7–9.) Defendants have not moved to dissolve the preliminary injunction, which remains in force, and the claim for unjust enrichment will proceed to trial. The Court believes it would be more appropriate to resolve the disputed facts underlying the claim for unjust enrichment before imposing or denying remedies based on that claim. Each side's motion for summary judgment is therefore denied.

## G.  Declaratory Judgment

57.    The Bohns' claim for declaratory judgment is actually a request for three separate declarations. They ask the Court to declare the parties' ownership interests in the modular home, the campground business, and the land associated with each. (*See* Am. Compl. p.12 (Claim XI).) The claim for declaratory judgment is predicated on the underlying claims for de facto partnership and unjust enrichment.

58.    Defendants move for summary judgment solely on the ground that these underlying "substantive claims fail as a matter of law." (Defs.' Mem. in Supp. 24.) Although the Court has granted summary judgment as to Laurie's claim for de facto

partnership, the underlying claim for unjust enrichment remains for trial. Thus, it would be premature to declare the parties' rights. The Court denies Defendants' motion for summary judgment as to the claim for declaratory judgment.

59. The Bohns also listed this claim in their motion for summary judgment, but they did not address the claim in their briefing or at the hearing. In the absence of any supporting argument, the Court denies the Bohns' motion for summary judgment as to the claim for declaratory judgment.

## H. Contract Claims

60. The amended complaint also includes two distinct claims for breach of contract. (Am. Compl. pp.9–10 (Claims VI, VII).) "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

## 1. Breach of Contract for Money Owed

61. The Bohns allege that they lent Judith $35,000 in two separate loans, neither of which has been repaid. Matt lent Judith $20,000 around the time the campground first opened to help defray some of its start-up costs. (Dep. M. Bohn 33:17–20; M. Bohn Aff. 1.) Shortly thereafter, the Bohns lent Judith another $15,000 from money they received as wedding gifts. (Dep. M. Bohn 42:10–20; M. Bohn Aff. 2.) During her deposition, Judith admitted that she received both loans but has not repaid either. (Dep. J. Black 286:18–287:1.) Based on these undisputed facts, the Bohns seek summary judgment in their favor.

62. As noted, though, it is rarely appropriate to grant summary judgment in favor of the party with the burden of proof. To carry their burden, the Bohns must show "that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet*, 74 N.C. App. at 721, 329 S.E.2d at 729. It appears, however, that both loans were given without specifying a time for repayment. The rule in North Carolina is that "money lent pursuant to a verbal agreement, which fails to specify a time for repayment, is payable within a reasonable time." *Helms v. Prikopa*, 51 N.C. App. 50, 54, 275 S.E.2d 516, 518 (1981) (reversing grant of offensive summary judgment). The length of time deemed "reasonable" to demand repayment is a "material issue of fact to be answered by the jury." *Phillips & Jordan Inv. Corp. v. Ashblue Co.*, 86 N.C. App. 186, 188, 357 S.E.2d 1, 2 (1987). As a result, even if the jury credits Laurie and Matt's version of the facts, it must apply a reasonableness standard to the time and manner of repayment. *See 759 Ventures, LLC v. GCP Apt. Inv'rs, LLC*, 2018 NCBC LEXIS 82, at *14 (N.C. Super. Ct. Aug. 13, 2018) (denying offensive summary judgment due to need for jury to "apply a reasonableness standard" in claim for breach of contract).

63. It is also undisputed that Laurie and Matt waited to demand repayment of the loans until after the parties' relationship began to deteriorate in October 2016—nearly twenty years after the loans were made. (Dep. M. Bohn 44:3–24; Dep. J. Black 177:7–12.) The jury may consider this conduct as well in determining what repayment period is reasonable under the circumstances. *See Helms*, 51 N.C. at 55, 275 S.E.2d at 519 ("It would hardly seem reasonable, in the context of a verbal loan,

where the parties have not reached an agreement as to the length of the credit period, to infer a term whereby large sums of cash are repayable upon demand as a matter of law.").

64.     The Court therefore denies the Bohns' motion for summary judgment as to this claim.

2.  Breach of Contract for Vehicles

65.     The second claim for breach of contract is based on Judith's alleged promise to provide two vehicles for Laurie and Matt in exchange for their contributions of labor and money to the campground.  As alleged, Judith promised to buy a van for the Bohns and also to transfer title to a camper trailer.  (*See* Am. Compl. p.10.)  Judith moves for summary judgment, arguing that these alleged contracts run afoul of the statute of frauds and the statute of limitations.  (*See* Defs.' Mem. in Supp. 5–6.)

66.     In evaluating this claim, the Court is hampered by the dearth of evidence as to the terms of the contracts and how they were formed.  Take the alleged contract to buy a van.  In her deposition testimony, Laurie could not recall when Judith made the promise to purchase the van or if anyone else was present at the time.  (Dep. L. Bohn 176:15–22.)  No particular make and model of van were discussed.  (Dep. L. Bohn 176:3–14.)  The time for performance is also unclear: Matt testified that the van was promised "some day" in the future, (Dep. M. Bohn 77:9–21), and Laurie testified that it was to be purchased "when my current van died," (Dep. L. Bohn 178:8–20).

67.     The circumstances surrounding the camper are even less clear.  Laurie denied that she is entitled to a camper.  (Dep. L. Bohn 178:21–179:3.)  Matt, on the

other hand, testified that there is a camper already titled in his name. (Dep. M. Bohn 137:6–12.) But he does not have the title, does not know if it was ever recorded, and has never tried to find it. (Dep. M. Bohn 137:13–19.) Based on this testimony, it is unclear what Judith is supposed to have promised but failed to do.

68. Given the deep uncertainty as to the timing and nature of these contracts, a reader may wonder whether there was ever "a meeting of the minds of the contracting parties upon all essential terms and conditions." *Se. Caissons, LLC v. Choate Constr. Co.*, 247 N.C. App. 104, 112, 784 S.E.2d 650, 655–56 (2016) (quoting *Quantum Corp. Funding, Ltd. v. B.H. Bryan Bldg. Co., Inc.*, 175 N.C. App. 483, 490, 623 S.E.2d 793, 798 (2006)). Judith did not raise this issue in her brief, however. The Court therefore assumes, for purposes of summary judgment, that valid and enforceable contracts exist.

69. The record also provides no basis for summary judgment on the two grounds raised by Judith: the statute of frauds and the statute of limitations. Taking them in reverse order, the key issue for the statute of limitations is when the limitations period began to run. On that point, the Court is left to guess. There is no evidence establishing when either alleged contract was made, much less when either was breached. Judith contends in her brief that Laurie placed the contract for the van in or around 2006, but the cited pages from Laurie's deposition do not support that contention. (*Compare* Defs.' Mem. in Supp. 5–6, *with* Dep. L. Bohn 176:15–19.) Judith has not carried her burden to show, as a matter of law, that the Bohns brought their claim outside the three-year limitations period.

70. So too for the statute of frauds, which requires a "contract for the sale of goods" over $500 to be in writing. N.C. Gen. Stat. § 25-2-201(1). It is by no means clear that either of the alleged contracts is the type of "sale of goods" covered by the statute. As best the Court can tell, the camper contract wasn't a sale at all; it was perhaps a contract to transfer a misplaced or unrecorded title. Likewise, Judith's alleged promise to purchase a van for the Bohns does not appear to be a sale of a van from Judith to the Bohns. "Without a sale *between the parties*, as expressly provided by the statute, the statute of frauds is inapplicable and cannot be asserted as a defense to the plaintiffs' claim." *Hering v. Haun (In re Hering)*, 2010 Bankr. LEXIS 3855, at *16–17 (Bankr. E.D.N.C. Oct. 28, 2010).

71. The Court denies Judith's motion for summary judgment as to the claim for breach of contracts related to vehicles.

## I. Affirmative Defenses

72. Defendants assert several affirmative defenses, including waiver and release, equitable estoppel, laches, statute of frauds, statute of limitations, failure to mitigate damages, and standing. In a single paragraph, the Bohns move for summary judgment on all of these varied defenses, asserting broadly and without citation that "[t]here has been no evidence to support any of these affirmative defenses." (Pls.' Br. in Supp. 14.) This conclusory, shotgun assertion was insufficient to carry the Bohns' initial burden to show the absence of a genuine issue of material fact, to give Defendants adequate notice of the supposed flaws in their defenses, or to inform the Court of what issues are actually in dispute. It is not the Court's role to fill in the

blanks, and as a result, the Bohns' motion for summary judgment as to Defendants' affirmative defenses is denied. *Cf. State v. Henderson*, 180 N.C. 735, 736, 105 S.E. 339, 339 (1920) ("We do not consider any matter of sufficient importance for us to consider which is not of sufficient importance to be discussed in the brief.").

III.
CONCLUSION

73. For these reasons, the Court **DENIES** the Bohns' motion for partial summary judgment.

74. The Court **GRANTS** in part and **DENIES** in part Defendants' motion for partial summary judgment as follows:

a. The Court **GRANTS** the motion as to the claims for de facto partnership, undue influence, and equitable estoppel. These claims are **DISMISSED** with prejudice.

b. The Court **DENIES** the motion as to the claims for breach of fiduciary duty, declaratory judgment, accounting and receiver, breach of contract for money owed, breach of contract for vehicles, unjust enrichment, constructive trust, and permanent injunction. These claims shall proceed to trial.

75. As stated in the Case Management Order, the parties shall hold a final mediation within 60 days of this Order and Opinion. (ECF No. 25.) On or before June 24, 2019, the parties shall advise the Court, via e-mail to the law clerk assigned to this case, of their selected date for holding the mediation.

**SO ORDERED**, this the 3rd day of June, 2019.

                                    /s/ Adam M. Conrad
                                    Adam M. Conrad
                                    Special Superior Court Judge
                                     for Complex Business Cases